UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
LESLEY M. PATTERSON,          )
                              )
                Plaintiff,    )
                              )        CIVIL ACTION
          v.                  )        NO. 13-13198-WGY
                              )
CAROLYN W. COLVIN, Acting     )
Commissioner of Social Security, )
                              )
                Defendant.    )
_____)
```

YOUNG, D.J.                                    March 26, 2015

MEMORANDUM AND ORDER

## I.   INTRODUCTION

This is an action by Lesley M. Patterson ("Patterson")
appealing the final decision of the Acting Commissioner of
Social Security (the "Commissioner") determining that she is not
disabled and therefore not entitled to Social Security
disability benefits.  This Court has jurisdiction pursuant to 42
U.S.C. § 405(g).

### A.   Procedural Posture

On November 2, 2010, Patterson filed a Title II application
for a period of disability and disability insurance benefits,
alleging that her disability began on August 31, 2008.

Administrative R.[1] ("Admin. R.") 12, ECF No. 13.[2]  The claim was
denied initially on April 27, 2011, and upon reconsideration,
was denied again on July 18, 2011.  _Id._  Patterson subsequently
filed a written request for a hearing on August 9, 2011.  _Id._
Patterson and an impartial vocational expert appeared at a video
hearing held on September 14, 2012.  _Id._  The Administrative Law
Judge, Henry J. Hogan (the "hearing officer") made his findings
on November 8, 2012 and concluded that Patterson has not been
under a disability within the meaning of the Social Security Act
from August 31, 2008 through the date of the decision.  _Id._ at
24.  On November 16, 2012, Patterson filed a request for review.
_Id._ at 7.  This request was denied on November 15, 2013 on
grounds that there was no reason under the rules to review the
hearing officer's decision.  _Id._ at 1.

On December 20, 2013, Patterson filed an action before this
Court seeking review of the Commissioner's decision.  Appeal
Action Appeals Council Dep't. Health & Human Servs Den.
Disability Ins. Benefits, ECF No. 1.  Once the Administrative
Record was produced, Patterson filed a motion for judgment
before this Court on April 18, 2014, seeking that the Court

---

[1] The Administrative Record was provided under seal to this
Court.  _See_ ECF No. 13.

[2] Since the document contains multiple separately numbered
documents, this Court refers to the consecutive numbering of the
entire record for convenience.

enter judgment in her favor awarding Social Security Disability Insurance Benefits, or alternatively, to remand the case to the Commissioner for further finding consistent with the evidence. Pl.'s Mot. J., ECF No. 14; Pl.'s Br. Supp. Mot. J. ("Pl.'s Mem."), ECF No. 15. On June 30, 2014, the Commissioner filed a motion to affirm the decision denying benefits. Def.'s Mot. Order Affirming Decision Comm'r, ECF No. 18; Mem. Supp. Def.'s Mot. Affirm Decision Comm'r ("Def.'s Mem."), ECF No. 19.

## B. Facts and Medical History

The relevant factual history is briefly described here. In order to preserve the privacy of the parties involved, facts not necessary to this Court's decision, though they were considered, are not discussed in this opinion.

### 1. Initial Cause of Disability

Patterson has worked as a certified nursing assistant and a lead care manager in an assisted living center. Def.'s Mem. 1. On August 30, 2008, Patterson was assisting a co-worker transfer a patient from a bed to a chair when she felt a pulling sensation in her lower back. Admin. R. 263. She had progressive discomfort and went to St. Luke's Hospital, where she was evaluated and was given Flexeril, Motrin, and Tramadol. Id. Patterson claimed that none of these had any effect. Id. She received several other treatments and examinations over the years which are detailed below.

### 2.  Dr. Ajit Mirani (September 2008)

Dr. Ajit Mirani ("Dr. Mirani") first evaluated Patterson when she complained of low back discomfort in September 2008. Id. at 263-64.  Dr. Mirani found her to be suffering from low back strain and prescribed Motrin, Flexeril, and Vicodin.  Id. at 263.  Dr. Mirani instructed her to follow certain work restrictions, including: no lifting, carrying, or pushing more than five pounds; no driving work vehicles; performing sit-down work only; and alternating standing, sitting, and walking for bathroom privileges.  Id. at 264.  Patterson returned for a follow-up after eight sessions of physical therapy.  Id. at 265. Dr. Mirani noted that still complained of occasional discomfort in her lower back, and did not feel like she could return to her regular job.  Id.

### 3.  Dr. Salman Bashir (October 2008)

Based on Dr. Mirani's recommendation, Dr. Salman Bashir ("Dr. Bashir") conducted an MRI of Patterson's lumbar spine in October 2008.  Id. at 252-53, 433-34.  The MRI report stated that there was no disc herniation or significant disc disease, but it revealed minimal disc bulging at L5-S1.  Id.

### 4.  Dr. Ajit Mirani (January 2009)

At Dr. Mirani's recommendation, an MRI of the hip was performed in January 2009, which revealed no discrete abnormalities.  Id. at 309-10.

4

### 5. Dr. Parakrama Ananta(March 2009)

Dr. Parakrama Ananta ("Dr. Ananta") examined Patterson in March 2009 and concluded that clinical examination was suggestive of right sacroiliac joint dysfunction. Id. at 244. He suggested physical therapy directed towards joint mobilization, sacral stabilization, and pelvic stabilization exercises. Id. If the symptoms continued to persist, he recommended that Patterson consider the possibility of diagnostic and therapeutic right sacroiliac joint injection. Id. at 245. Dr. Ananta also carried out nerve conduction studies and an EMG, all of which yielded normal results. Id. at 311.

### 6. Dr. Ajit Mirani (April – June 2009)

As per Dr. Mirani's advice, Patterson received two steroid injections in April and June 2009 for right hip pain. Id. at 316, 318.

### 7. Dr. Richard Smith (August 2009)

In August 2009, Dr. Richard Smith ("Dr. Smith") saw Patterson and reviewed the results of the MRIs of her hips and her spine. Id. at 228. Following his exam, Dr. Smith wrote that "it is more of a soft tissue etiology with pelvic imbalance situation here, [and that there is] low back strain with secondary decompensation." Id. Dr. Smith felt that there was nothing surgical that could be done. Id. Dr. Smith recommended

keeping her out of work, and starting with some physical therapy and core rehabilitation.  Id.

### 8.  Dr. Ajit Mirani (October 2009)

In October 2009, Patterson told Dr. Mirani that taking Norflex 100 mg twice a day and Nucynta 50 mg four times a day made her life manageable, although she still remained unable to work due to the injury.  Id. at 324.

### 9.  Dr. Ajit Mirani (February 2010)

Patterson informed Dr. Mirani during a follow-up call that she has better pain control with 100 mg of Nucynta, four times a day, as compared to what she was getting with the 50 mg dosage, and that she is able to function with the medication without side effects.  Id. at 332.

### 10.  Dr. Michael Merport (February 2010)

Dr. Michael Merport ("Dr. Merport") conducted an MRI of the lumbar spine in February 2010.  Id. at 251.  The MRI revealed minimal circumferential bulging of the disc at L5-S1, which was unchanged since 2008.  Id. at 251-52.

### 11.  Dr. Mark Palumbo (August 2010 – January 2011)

Dr. Mark Palumbo ("Dr. Palumbo") performed a sacroiliac arthrodesis on Patterson in August 2010.  See id., at 351-52. Patterson visited Dr. Palumbo for multiple follow-up visits between August 2010 and January 2011.  Id. at 353-57.  During a follow-up visit on October 13, 2010, Dr. Palumbo noted that he

was growing less optimistic because she was not showing any improvement, and he concluded that she remains temporarily totally disabled from work.  Id. at 354.  During a follow-up on January 19, 2011, Dr. Palumbo opined that she was permanently disabled from her usual occupation as a certified nursing assistant.  Id. at 356.  He further observed that Patterson would be incapable of work which requires any type of significant physical labor or activity.  Id.

### 12.  Dr. Ajit Mirani (November 2010 – January 2011)

In November 2010, Dr. Mirani felt Patterson may eventually need a spinal cord simulator since she did not respond to the surgery.  Id. at 260.  At a follow-up appointment in January 2011, Dr. Mirani noted that Patterson was able to use a walker for short distances, although she still required a wheelchair for long distances.  Id. at 365.

### 13.  Dr. Henry Su (January 2011)

Patterson was examined by Dr. Henry Su ("Dr. Su") in January 2011.  Id. at 404-05.  According to Dr. Su's findings, there were multiple bony fragments likely representing heterotopic ossification seen at the right sacroiliac joint posteriorly in the region of the right S2 neural foramina.  Id. at 404.  He recommended clinical correlation and comparison with the prior CT.  Id.

### 14. Southeast Rehabilitation Associates (February 2011)

Patterson visited Southeast Rehabilitation Associates, P.C. on February 28, 2011. Id. at 363-64. It was recommended that she be started in a physical therapy program focusing on functional restoration, strength training, improving endurance, balance training, and an aggressive active range of motion exercises.[3] Id. at 364.

### 15. Dr. Richard Goulding (March 2011)

Dr. Richard Goulding conducted a Physical Residual Functional Capacity Assessment on Patterson in March 2011. Id. at 371-78. The assessment reported that Patterson would be able to lift or carry (occasionally) weights of up to 20 pounds, lift and carry (frequently) weights of up to 10 pounds, stand and walk (with normal breaks) for at least 2 hours in an 8-hour weekday, sit (with normal breaks) for about 6 hours in an 8-hour weekday, and have unlimited push and pull capacities. Id. at 372.

### 16. Dr. Gilbert Shapiro (March 2011)

Dr. Gilbert Shapiro ("Dr. Shapiro"), an orthopedic surgeon, examined Patterson in March 2011. Id. at 367-70. Dr. Shapiro diagnosed her with chronic low back pain, a question of

---

[3] This document does not contain details as to the name of the doctor who made this recommendation. It was submitted as an exhibit along with a follow-up note written signed by Dr. Ajit Mirani dated January 5, 2011.

derangement sacroiliac joint (right), and failed sacroiliac joint surgery (right). Id. at 369. Dr. Shapiro certified that she appeared to be "an otherwise healthy 32-year-old who is on high dosages of addicting medication and nonproductive." Id. at 370. Dr. Shapiro believed that she did have work capabilities and could be seated with full use of the upper extremities; in order to be productive, however, she would need to be weaned off the extensive addicting medication that she has been consuming almost since the time of her injury. Id.

### 17. Dr. Richard York: Social Security Disability Determination Evaluation (April 2011)

Dr. Richard H. York ("Dr. York"), a licensed psychologist, conducted a Social Security Disability Determination Evaluation in April 2011, at which time he diagnosed Patterson with depression due to the severe pain and impairments she was experiencing following her injury and unsuccessful surgery. Id. at 380.

### 18. Dr. Sue Conley: Psychiatric Review Technique (April 2011)

Dr. Sue Conley ("Dr. Conley") conducted a Psychiatric Review Technique on Patterson in April 2011. Id. at 382. Dr. Conley rated Patterson's functional limitations as follows: "mild" restriction in activities of daily living, "moderate" difficulties in maintaining social functioning, and "moderate" difficulties in maintaining concentration, persistence, or pace.

Id. at 392.  She observed that there were no episodes of
decompensation and no significant cognitive, perceptual, or
memory problems.  Id. at 392, 394.

The doctor also observed that Patterson exhibited many
pain-related behaviors and was feeling aggravated most of the
time due to physical issues.  Id. at 394.  According to Dr.
Conley's assessment, Patterson's cognitive skills were
functional and she would be able to complete a daily routine of
simple tasks in a supportive setting.  Id. at 398.  Dr. Conley
said that physical evidence suggested that her back was healing.
Id.  She also noted that Patterson was able to comprehend and
recall simple information, focus and attend for 2 hours (in an
8-hour work day) in a supportive setting, relate to others
(although she would do better in a solitary setting), keep
appointments, be aware of basic safety issues, and make simple
decisions.  Id.

### 19.  Dr. Jan Jacobson (June 2011)

Dr. Conley's assessment was affirmed in a case study
conducted by Dr. Jan Jacobsen ("Dr. Jacobsen").  Id. at 400.
Patterson alleged additional limitations in understanding and
following instructions, but Dr. Jacobson felt that these were
not supported.  Id.

### 20.  Dr. Ranjan Dey (June 2011)

Upon Dr. Mirani's reference, Dr. Ranjan Dey ("Dr. Ranjan")
provisionally diagnosed Patterson with right-sided L5-S1
radiculitis and questionable sympathetically maintained
neuropathic pain of the right lower extremity with double crush
syndrome.  Id. at 401-03.  Dr. Dey's suggested treatment plan
was for Patterson to consider a lumbar sympathetic block.  Id.
at 403.

### 21.  Dr. Barbara Trockman: Physical Residual
####    Functional Capacity Assessment (July 2011)

Dr. Barbara Trockman ("Dr. Trockman") conducted a Physical
Residual Functional Capacity Assessment in July 2011.  Id. at
406-13.  Dr. Trockman felt that Patterson was partially
credible, as the exam was "basically [normal] except for some
mild muscle spasms and symptoms not consistent with exam and
imaging."  Id. at 408.

### 22.  Dr. James G. Nairus: Independent Medical
####    Examination (November 2011)

Dr. James G. Nairus ("Dr. Nairus") performed an independent
medical examination of Patterson in his orthopedic clinic in
November 2011.  Id. at 618.  Dr. Nairus concluded that Patterson
had reached a maximum medical end result for her musculoskeletal
conditions and that she required maintenance treatments.  Id. at
623.  He further opined that she had a total whole person loss
of function of 13% based on her lumbar spine and right

sacroiliac joint conditions.  Id.  Dr. Nairus was of the medical opinion that Patterson was permanently partially disabled and would not be able to return to her previous job.  Id.

### 23.  Dr. Vasu Brown (April 2012)

Dr. Vasu Brown ("Dr. Brown") conducted an impartial physician examination of Patterson in April 2012, at which time she assessed that her degree of medical disability was total and permanent.  Id. at 418.  Dr. Brown was of the opinion that the end point of treatment had been reached and assessed Patterson's Oswestry pain scale to be 98 (indicating that she was either bed bound or exaggerating symptoms).  Id.

## II.  LEGAL STANDARD

### A.  Standard of Review

Under the Social Security Act, this Court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security."  42 U.S.C. § 405(g).  This Court's review is limited to determining whether the hearing officer employed "the proper legal standards and found facts upon the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Secretary, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)).  The hearing officer's findings of fact "are conclusive when supported by substantial evidence, but are not conclusive when derived by

ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Id. (internal citation omitted).

In understanding the statutory standard of the term "substantial evidence," the Supreme Court has held that this means something "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion".  Richardson v. Perales, 402 U.S. 389, 401 (1971).

Questions of law are reviewed de novo.  Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001).  Courts have also held that it is the responsibility of the Commissioner "to determine issues of credibility and to draw inferences from the record evidence."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  In other words, the resolution of conflicts in the evidence is entrusted to the Commissioner, not the courts.  Id.

Accordingly, this Court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion."  Id. (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation marks omitted).

**B.    Disability Standard**

An individual is disabled under the Social Security Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). The impairment must be "of such severity that he [or she] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

When considering applications, the Commissioner employs a five-step process to determine if an individual is disabled within the meaning of the Social Security Act.  Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920(a)(4)).  All five steps are not applied to every applicant, as the determination may be concluded at any step along the process.  Id.

These steps are: 1) is the applicant engaged in substantial gainful work activity – if not, the application proceeds to the next stage; 2) does the applicant have (within the relevant time period) a severe impairment or combination of impairments – if yes, the application proceeds to the next stage; 3) does the impairment meet the

conditions for one of the "listed" impairments in the
Social Security regulations – if yes, then the application
moves to the next stage; 4) is the applicant's "residual
functional capacity" such that he or she can still perform
past relevant work – if not, then the application proceeds
to the next stage; and 5) is the applicant (given his or
her residual functional capacity, education, work
experience, and age) able to do any other work – if the
answer is "no," then the applicant is deemed disabled.  Id.
The applicant bears the burden of proof for the first four
steps, and the agency bears the burden at the last step.
Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 7
(1st Cir. 1982).

**III. HEARING OFFICER'S DECISION**

As a threshold matter, the hearing officer first noted that
Patterson meets the insured status requirements of the Social
Security Act through December 31, 2013.  Admin. R. 14.  Upon
following the five-step process described above, and upon review
of the entire record, he made the following conclusions.

Firstly, the hearing officer concluded that Patterson has
not engaged in substantial gainful activity since August 31,
2008.  Id.  Moving to the second step, the hearing officer
concluded that Patterson had the following severe impairments:
back disorder and affective disorder.  Id.  This was based on

the fact that the medical evidence of record established that Patterson had been diagnosed and treated for these impairments. Id. The hearing officer stated that these impairments were severe because they have more than a minimal effect on Patterson's ability to perform basic work-related activities. Id.

At the third step, the hearing officer turned to whether Patterson had an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. He concluded that she did not, on grounds that no treating source or examining physician had proffered findings that meet or medically equal the listings considered. Id. at 15. In making this determination, the hearing officer considered whether the severity of Patterson's mental impairment satisfied "paragraph B" of the mental impairment listings, which requires that these limitations "must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decomposition, each of extended duration." Id.

The hearing officer determined that Patterson has mild restrictions in activities of daily living with regard to her

mental impairment.  Id.  He based this on Patterson's testimony suggesting that it was her physical impairment rather than her mental one that had the largest negative impact on her everyday life.  Id.  Further, the hearing officer found that Patterson has moderate difficulties in her social functioning that are caused more by her physical rather than mental impairment.  Id. at 15-16.  Patterson had stated that she can only pay attention for one-three minutes, does not finish what she starts, cannot follow spoken instructions, and does not follow written instructions.  Id. at 16.  She had not, however, provided significant testimony regarding allegations of difficulty with concentration, persistence or pace, and the hearing officer found that her limitations in this area were caused by her physical impairments rather than her alleged mental impairment. Id.  Based on the record as a whole, with regard to concentration, persistence, or pace, the hearing officer concluded that Patterson had moderate difficulties based on her mental impairment.  Id.  The hearing officer did not find that Patterson had experienced any episodes of decompensation of extended duration.  Id.

Additionally, the hearing officer evaluated whether the evidence satisfied the criteria under paragraph C.  Id.  To meet the requirements of paragraph C, Patterson must have a medically documented history of affective disorder of at least two years'

duration that has caused more than a minimal limitation of
ability to do any basic work activity, with symptoms or signs
currently attenuated by medication or psychosocial support.  Id.
Apart from this, Patterson must experience one of the following:
repeated episodes of decompensation (each of extended duration),
or a residual disease process that has resulted in such marginal
adjustment that even a minimal increase in mental demands or
change in the environment would be predicted to cause the
individual to decompensate, or current history of one or more
years' inability to function outside a highly supportive living
arrangement with an indication of continued need for such an
arrangement.  Id.  The hearing officer concluded that the
evidence on record did not support such a finding.  Id.

The hearing officer then moved on to the fourth and
fifth steps of the process and made a finding that
Patterson has the residual functional capacity to perform
sedentary work as defined in 20 C.F.R. § 404.1567(a) with
the following limitations: (i) Patterson could lift up to
10 lbs occasionally; (ii) stand or walk for approximately 2
hours per 8 hour workday; and (iii) sit for approximately 6
hours per workday.  Id. at 16-17.  Additionally, she would
be limited to simple, routine, repetitive tasks, only
occasional interaction with the public, and only occasional
interaction with co-workers.  Id. at 17.  In making this

finding, the hearing officer extensively referred to the medical record and followed a two-step process: (i) determining whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Patterson's pain or other symptoms, and, (ii) once this is established, to evaluate the intensity, persistence, and limiting effects of Patterson's symptoms to determine the extent to which they limit her functioning.  Id. at 17.

In coming to his conclusions, the hearing officer gave "great weight" to the opinion of Dr. Goulding, a medical consultant for disability determination services, on grounds that his opinion was consistent with the record as a whole, and specifically with the objective medical evidence and treatment notes.  Id. at 21-22.  He also gave "great weight" to the opinions of Drs. Trockman and Shapiro on grounds that they were consistent with the medical evidence, treatment notes, and Patterson's own statements regarding her physical limitations.  Id. at 22.  The hearing officer gave "some weight" to the opinion of Dr. Brown because her opinion was partly consistent with the medical record.  Id.

With regard to Patterson's alleged mental impairment, the hearing officer gave "great weight" to the opinion of

Dr. Conley, on grounds that her opinion was consistent with Patterson's own statements and overall lack of regular mental health treatment.  Id.  On similar grounds, he also gave the opinion of Dr. Jacobsen "great weight."  Id.

Based on the record as a whole, the hearing officer found that Patterson retained the residual functional capacity to perform work activities consistent with the residual functional capacity assessment.  Id. at 23. Additionally, the hearing officer found that Patterson was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. Id.  In making this determination, he considered the testimony of an impartial vocational expert, who testified that Patterson would be able to perform the requirements of representative occupations such as table work, a bench hand, and a surveillance systems monitor.  Id. at 24. Accordingly, he concluded that a finding of "not disabled" was appropriate under the circumstances.  Id.

## IV.  ANALYSIS

Patterson challenges the following three findings made by the hearing officer, on grounds that they are not supported by substantial evidence: (i) the finding that Patterson has a sedentary work capacity, (ii) the finding that there exist a substantial number of jobs that Patterson is capable of

performing, and (iii) the finding that Patterson's impairments do not "meet or equal" a listing.  Pl.'s Mem. 3.

## A.   Patterson's Work Capacity

Patterson argues that the hearing officer's finding that she has the residual functional capacity to perform sedentary work is not based on substantial evidence.  Pl.'s Mem. 7.

### 1.   Assessment of Subjective Complaints

Patterson alleges that the hearing officer erred in his assessment of her subjective complaints because he failed properly to evaluate these complaints within the context of Avery v. Secretary of Health & Human Services, 797 F.2d 19, 28 (1st Cir. 1986), 20 C.F.R. §. 404.1529, and Social Security Ruling 96-7p.  Pl's Mem. 7.  In Avery, the court recognized that a claimant's pain may be more severe than the other objective medical evidence reflects.  Avery, 797 F.2d at 28.  Accordingly, when a claimant alleges pain of a greater severity than the objective medical evidence suggests, Avery requires a hearing officer to investigate the following factors:

> (1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) Type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) Treatment, other than medication, for relief of pain; (5) Functional restrictions; and (6) The claimant's daily activities.

<u>Id</u>. at 29. Although the hearing officer does not refer to <u>Avery</u>, he makes specific reference to 20 C.F.R. § 404.1529(c), which parallels the <u>Avery</u> factors. <u>See</u> Admin. R. 20-21.

The hearing officer's discussion then involves an assessment of all six factors as set out above in <u>Avery</u>. <u>Id.</u> With respect to the first three factors, the hearing officer specifically makes reference to the subjective evidence of record, finding that Patterson's alleged limitations are self-imposed restrictions that are not consistent with the medical evidence and her own actions. <u>Id.</u> at 21. With regard to the steps taken by Patterson to relieve pain, the hearing officer found that her alleged side effects were not documented in medical records, and that she admitted that she did not take medication that would help her. <u>Id.</u> He also noted that apart from the failed surgery, her treatment had been largely routine and conservative. <u>Id.</u> While investigating her symptoms, he found Patterson's own symptom descriptions unpersuasive, as well as being extreme and conflicting (for example, Patterson alleged that she was permanently confined to her bed through the day, but later admitted that she goes shopping). <u>Id.</u> Since the hearing officer clearly has referred to all the factors set out in <u>Avery</u>, Patterson's

claim that the hearing officer erred by failing to evaluate her complaints under the Avery standard fails.

### 2. Opinion Evidence Provided by Experts:

Patterson then argues that the hearing officer continuously disregards all evidence supportive of a disabled finding. Pl.'s Mem. 9. Patterson points to the opinions of various doctors and alleges that the hearing officer failed to consider opinions beyond early 2011. See id. at 10-11. The hearing officer states that he did not give these opinions credit because the doctors had relied on Patterson's own subjective statements, and their opinions were not supported by objective medical evidence. Admin. R. 21. Additionally, the hearing officer stated that many of these opinions were outside the area of expertise of the doctors who had provided them. Id.

This Court notes, however, that the hearing officer did not specify the doctors he referenced when denigrating their opinions. This rather summary approach to factfinding raises substantial questions as to the adequacy of the review of Patterson's claim. Accordingly, the questions before this Court with respect to the weight accorded to each of the opinions are first, whether the hearing officer had a reasonable explanation for the amount of credibility given to each opinion, and second, if the hearing officer reached a conclusion unfavorable to Patterson, whether he had substantial evidence to support that

conclusion.  Monroe v. Barnhart, 471 F. Supp. 2d 203, 211-12 (D. Mass. 2007).  The "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  Hooke v. Colvin, 20 F. Supp. 3d 286, 295 (D. Mass. 2014) (quoting SSR 96-7p, 1996- WL 374186).

The First Circuit has a fairly permissive standard for accepting the adequacy of an expert report in the social security setting.  Courts have clarified that non-examining medical expert reports can, standing alone, serve as substantial evidence in support of a residual functional capacity assessment.  See Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991).  The key lies in the detail of the reports themselves: those that "contain little more than brief conclusory statements or the mere checking of boxes denoting levels of residual capacity . . . are entitled to relatively little weight," id., while those that "supported their conclusions with reference to medical findings" ought be given more credit, Quintana v. Comm'r of Soc. Sec., 110 F. App'x 142, 144 (1st Cir. 2004).  Reliance on an expert report is warranted when the expert report is not the sole basis for the hearing officer's residual functional capacity determination.

24

Morin v. Astrue, No. 10-cv-159-JL, 2011 WL 2200758, at *3
(D.N.H. June 6, 2011) ("[T]he ALJ's decision to adopt an
assessment by a non-treating physician is further supported if
that assessment references specific medical findings indicating
that the claimant's file was reviewed with care."); see also
Blackette v. Colvin, No. 1:13-cv-11546-WGY, 2014 WL 5151312, at
*12 (D. Mass. Sept. 25, 2014).

Patterson specifically argues that the hearing officer
erroneously relied on the reports of several expert doctors,
including Drs. Goulding, Trockman, Shapiro, and Brown.  Pl.'s
Mem. 10-11.

Dr. Goulding found Patterson was not disabled, basing his
findings on a report by Dr. Palumbo stating that Patterson was
not disabled.  Admin. R. 377.  Dr. Goulding's report consists of
checking off boxes denoting the levels of exertional limitation.
Id. at 371-77.  Dr. Goulding does not discuss previous medical
findings or reports.  Id.  As such, the hearing officer ought
not to have given Dr. Goulding's report "great weight" in his
analysis.  Id. at 22.

In her residual capacity analysis, Dr. Trockman also
provided a report in a check box format.  Id. at 407.  Dr.
Trockman, however, briefly discussed Patterson's previous
treatments and present condition.  Id.  Dr. Trockman found
Patterson to be only partially credible because of her

contradictory statements.  Id. at 408.  Further, Dr. Trockman
found that Patterson had symptoms inconsistent with the exams
and imaging.  Id.  The hearing officer gave Dr. Trockman's
report "great weight" on grounds that it was consistent with the
record as a whole and particularly aligned with the objective
medical evidence.  Id. at 22.  As such, this Court finds that
the hearing officer did not err in giving Dr. Trockman's report
"great weight."

Dr. Shapiro provided a detailed report stating that
Patterson can work, as long as she is seated with the use of her
upper extremities.  Id. at 370.  Dr. Shapiro diagnosed her with
"chronic low back pain, question derangement sacroiliac joint,
right, and failed sacroiliac joint surgery, right."  Id. at 369.
Dr. Shapiro's report contains references to Patterson's past
medical history and present symptoms.  Id. at 368-69.  This
Court holds that the hearing officer did not err in giving this
report "great weight."

A perusal of Dr. Brown's report reveals that she diagnosed
Patterson with complex regional pain syndrome type II
(causalgia), sarcopenia, and right sacroiliac joint dysfunction.
Id. at 418.  She was also of the opinion that Patterson had
severe limitations in sitting, standing, lying down, and any
form of activity.  Id.  This Court also notes that Patterson
obtained a score of 98 on the Oswestry Pain Index, indicating

that she was either bed bound (from low back pain) or exaggerating her symptoms. _Id._ Dr. Brown concluded that she believed an end point had been reached, and that Patterson was bedbound. _Id._ The hearing officer justified giving "some weight" to Dr. Brown's opinion on grounds that the opinion was only partly consistent with the entire medical record. _Id._ at 22. He also stated that Dr. Brown had not taken into consideration Patterson's ability to be seated in her wheelchair while performing activity. _Id._ This second justification is at odds with the opinion, since Dr. Brown opines that Patterson would be completely bedbound (thus ruling out the possibility of her working from a wheelchair). _Id._ at 418.

This Court is bound to uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." _Rodriguez_, 647 F.2d at 222. This applies even if this Court, were it in the position of the trier of fact, could potentially decide otherwise. _See_ Lizotte v. _Sec'y of Health & Human Servs._, 654 F.2d 127, 128 (1st Cir. 1981). Accordingly, even if this Court were to come to a different conclusion considering Dr. Brown's report, this Court's function is to ascertain whether there is substantial evidence to support the Commissioner's findings. _Geoffroy_ v. _Sec'y of Health & Human Servs._, 663 F.2d 315, 319 (1st Cir. 1981). This Court may only

invalidate a finding if it was "derived by misapplying the law, ignoring evidence, or judging matters that are entrusted to experts." Nguyen, 172 F.3d at 35.

Here, the hearing officer considers Dr. Brown's report and compares it to the entire medical record. Admin. R. 22. The hearing officer also makes careful reference to Dr. Brown's examination, as well as Patterson's testimony at the video hearing. Id. at 21-22. Admittedly, Dr. Brown's opinion appears to be at variance with the entire medical record and Patterson's own testimony. Patterson testified that she uses a wheelchair and a cane at home, that she is waiting for a power chair, and, that she can go shopping using a power chair. Id. at 20. Dr. Brown's opinion is also in contrast to the opinions provided by Drs. Goulding, Trockman, and Shapiro, who all opined that Patterson had limited work capabilities. See id at 22. This Court rules that the hearing officer had a reasonable explanation for the weight given to Dr. Brown's opinion and substantial evidence to support his contrary finding.

The hearing officer neither misapplied the law, nor did he ignore any evidence (as would be required for a remand). Since all the hearing officer's decisions with respect to the expert medical opinions are supported by substantial evidence, this Court holds that the hearing officer did not err in finding that Patterson had a sedentary work capacity.

**B.   That there exist jobs that Patterson can perform**

Patterson states that she suffers from five different exertional and non-exertional impairments.  Pl.'s Mem. 12. Patterson cites to Social Security Ruling 86-8 and argues that the hearing officer ought have considered the combined impact of these impairments on her ability to function since it is the combination of these severe impairments (rather than the impairments viewed independently) that renders her disabled. Id. at 13-14.

According to Social Security Regulations 86-8, the hearing officer ought evaluate the combined impact of these impairments on the claimant's functioning ability.  If, upon being considered in combination, the impairments "would have more than a minimal effect on the ability to perform basic work activities, adjudication must continue through the sequential evaluation process."  SSR 86-8, 1986 WL 68636.  Here, the hearing officer found that Patterson's impairments had more than a minimal effect on her ability to perform work-related activities, and accordingly he moved on to the following steps. Admin. R. 14.

After the applicant has shown that she is unable to perform the work required by past employment, "the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still

perform." Seavey, 276 F.3d at 5. The Commissioner may meet

that burden by relying on the testimony of a vocational expert,

"[b]ut in order for a vocational expert's answer to a

hypothetical question to be relevant, the inputs into that

hypothetical must correspond to conclusions that are supported

by the outputs from the medical authorities." Arocho v. Sec'y

of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). In

general, a hypothetical is appropriate if the question

accurately reflects the objective medical findings in the

record. See id.

Patterson argues that the vocational expert was provided

with a hypothetical derived from the consultative reports.

Pl.'s Mem. 14. The vocational expert listed a number of jobs

that Patterson would be able to perform in the regional and

national markets. Admin. R. 52. Patterson's attorney provided

the vocational expert with two other limitations: firstly, that

the claimant would need a wheelchair full time, and secondly,

that she would be off-task fifty percent of the time because of

the effects of her medication. Id. at 53. The vocational

expert then opined that it would be difficult for the claimant

to perform any of the jobs that the vocational expert had

suggested because they could potentially involve lifting up to

twenty pounds. Id. The vocational expert also said that the

claimant would be unable to maintain competitive employment if

she was off-task fifty percent of the time.  Id.  Patterson
argues that the hearing officer did not include these
limitations while presenting the vocational expert with a
hypothetical.  Pl.'s Mem. 15-16.

This Court has held that although the limitations arising
from the various impairments suffered by the claimant ought be
considered together, the hearing officer need not include
specific limitations if such a decision was supported by
substantial evidence.  Sousa v. Astrue, 783 F. Supp 2d 226, 235
(D. Mass. 2011).  In Cohen v. Astrue, this Court held that the
hearing officer was not obligated to present impairments to the
vocational expert that he has deemed not credible.  851 F. Supp.
2d 277, 284 (D. Mass. 2012).  Here, the limitations Patterson
argues should have been included in the hypothetical are not
credible when compared to the objective medical record and her
own statements.  For example, Patterson adds a modification to
the hypothetical that she would be wheelchair bound for the
whole day and would be off-work for fifty percent of the day due
to drowsiness.  Admin. R. 52.  This is in direct contrast to her
own testimony that she uses a cane and a walker at home, id. at
39-40, and that she is able to go shopping, id. at 42.
Additionally, it is in contrast with the evidence in the medical
record.  See, e.g., id. at 370 (Dr. Shapiro's report stating
that Patterson can work, provided she is seated with the use of

her upper extremities); id. at 407-08 (Dr. Trockman's report discussing Patterson's exertional limitations).

This Court has discussed earlier in this opinion that the hearing officer's findings regarding the credibility of Patterson's conditions were corroborated by substantial evidence. Accordingly, and as stated in Cohen, the hearing officer is not obliged to present evidence that he does not consider credible to the vocational expert. 851 F. Supp. 2d at 284. This Court holds that the hearing officer did not err while providing the vocational expert with a specific hypothetical. Thus, this Court holds that the hearing officer was justified in finding that there were other jobs that Patterson was capable of performing.

### C. Meeting or Equaling a Listing.

Patterson argues that the hearing officer failed to list all of her severe impairments when determining whether her impairments met or equaled a listing. Pl.'s Mem. 5. Patterson states that the hearing officer listed a back disorder and an affective disorder as severe, but failed to list complex regional pain syndrome type II (causalgia), and sarcopenia as an impairment. Id.

Patterson has the burden of proof of showing that she met or equaled a listed impairment. Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir. 1989) (citing Dudley

v. <u>Sec'y of Health & Human Servs.</u>, 816 F.2d 792, 793 (1st Cir. 1987)).  An impairment meets the listings only when it manifests the specific findings described in the set of medical criteria for a particular listed impairment.  <u>Martinez Nater</u> v. <u>Sec'y of Health & Human Servs.</u>, 933 F.2d 76, 77 (1st Cir. 1991).

Patterson alleges that she does have an impairment that meets or equals the musculoskeletal listings included in 20 C.F.R. Part 404, Subpart P, Appendix 1.00.  Pl.'s Mem. 5. Patterson does not, however point to any specific listing for which she meets or medically equals the criteria, apart from stating that she is unable to "ambulate effectively."  <u>Id.</u>  A person is unable to ambulate effectively if they have "insufficient lower extremity functioning to permit independent ambulation without the use of a handheld assistive device(s) that limits the functioning of both upper extremities."  20 C.F.R. Part 404, Subpart P, Appendix 1.00(B)(2)(b)(1).  Although the ability to ambulate effectively is mentioned in the functional portion of the musculoskeletal listings, it is by itself insufficient to show that any listing has been met or equaled, absent identification of a condition described in the various listings or a showing that specific medical criteria have been met or equaled.  <u>See</u> <u>id.</u>  Patterson does not identify any specific condition described in the listings.  <u>See</u> Pl.'s

Mem. 5-6.  Because Patterson bears the burden here, this failure means that the Court cannot rule in her favor on this issue.

Patterson attempts to bolster her argument that she meets or equals a listing by pointing to specific evidence from Drs. Brown and Mirani that she believes the hearing officer did not adequately consider.  Id. at 6-7.  Even if she is right that the hearing officer failed to address these pieces of evidence appropriately – a contention the Court does not accept, as discussed in earlier sections – that does not save her here.  At no point does she state which particular listing these pieces of evidence inform nor how she might equal the same.  See id.  As stated before, because she has the burden of proof on this matter, this failure proves fatal.  Accordingly, the Court rules that the hearing officer's finding that Patterson did not meet or equal a listed impairment was based on substantial evidence.

## V.    CONCLUSION

For the aforementioned reasons, Patterson's motion to remand, ECF No. 14 is **DENIED**, and the Commissioner's motion for an order affirming her decision, ECF No. 18, is **GRANTED**.

**SO ORDERED.**

/s/William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE